**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHELSEA COMMODORE and RAKEEDHA SCARLETT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>H&M HENNES & MAURITZ LP,<br><br>Defendant. | Civil Action No. 7:22-cv-06247-CS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Chelsea Commodore and Rakeedha Scarlett ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against H&M Hennes & Mauritz LP ("Defendant" or "H&M"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This case is about H&M's labeling, marketing, and advertising that is designed to mislead consumers about its products' environmental attributes, through the use of false and misleading "environmental scorecards" for its products called "Sustainability Profiles." These Sustainability Profiles were prominently incorporated into H&M's website and were displayed on the product listing for hundreds of H&M items. However, on June 28, 2022, an independent investigation revealed that H&M's Sustainability Profiles contained falsified information that did not comport with the underlying data. For example, one Sustainability Profile claimed that a

dress was made with *20% less* water on average, when it was actually made with *20% more* water.[1]

2.       In addition to its Sustainability Profiles, H&M makes various other misrepresentations concerning the purportedly sustainable nature of its products:  H&M claims that its products are "conscious," a "conscious choice," a "shortcut to sustainable choices," made from "sustainable materials," "close the loop," and that H&M will prevent its textiles "from going to landfill" through its recycling program (collectively, the "Sustainability Misrepresentations").  These representations are made through the use of green hang tags, in-store signage, and online marketing.  The goal of H&M's advertising scheme is to market and sell products that capitalize on the growing segment of consumers who care about the environment, but H&M does so in a misleading and deceptive way.

3.       Plaintiffs bring this class action lawsuit on behalf of themselves and other similarly situated consumers ("Class Members") who purchased Defendant's products containing (i) a Sustainability Profile or (ii) a Sustainability Misrepresentation (the "Products"). In short, Defendant takes advantage of consumers' interest in products that are sustainable and that do not harm the environment.  By falsifying the Sustainability Profiles and making the Sustainability Misrepresentations, Defendant has misrepresented the nature of its products, at the expense of consumers who pay a price premium in the belief that they are buying truly sustainable and environmentally friendly clothing.  Plaintiffs are purchasers of the Products who assert claims for unjust enrichment, breaches of warranty, and violations of the consumer protection laws of the state of New York, on behalf of themselves and all similarly situated purchasers of the Products.

---

[1] Amanda Shendruk, *H&M showed bogus environmental scores for its clothing*, QUARTZ (June 28, 2022), https://qz.com/2180075/hm-showed-bogus-environmental-higg-index-scores-for-its-clothing/.

## FACTUAL ALLEGATIONS

**A.      H&M's Falsified And Misleading Sustainability Profiles**

4.      A growing number of consumers prefer to make choices that do not harm the environment.  Indeed, research has found that products highlighted as "sustainable" sell faster and consumers are willing to pay more for sustainable products, and H&M has lost a sizeable segment of consumers who are concerned about the impact of fast fashion over the last decade. In fact, H&M has publicly acknowledged that sustainability is of the utmost importance to the majority of consumers.

5.      Despite its position as a fast-fashion giant, H&M has created an extensive marketing scheme to "greenwash" its Products, in order to represent them as environmentally-friendly when they are not.  H&M communicates this greenwashing through the use of in-store signage, tags, and online information, among other sources of information.

6.      In marketing its clothing, H&M published environmental scorecards, called "Higg Sustainability Profiles," or the "Sustainability Profiles," which are prominently incorporated into H&M's website.

7.      However, the Sustainability Profiles contain falsified information that does not comport with the underlying data.  By falsifying the Sustainability Profiles with inaccurate and misleading data, Defendant misrepresents its Products as being better for the environment than comparable garments, when they are not.

8.      An investigation published on June 28, 2022 by Quartz discovered H&M used falsified information in its scorecards.  For example, one Sustainability Profile reported by Quartz stated that a dress used *20% less water* to manufacture, when its actual water score indicated that it used *20% more* water to manufacture.

9.      As another example, the following images show that H&M's website showed a

particular product as being produced with 30% less water, but the Higg website showed that the item was "actually made with 31% more water, making it worse than conventional materials." In other words, the data in the Sustainability Profile was thus presented incorrectly because "more" was misrepresented as "less."



10. This issue is not isolated to water usage alone, and there are similar misrepresentations for each category of the Sustainability Profile. For example, H&M miscoded

data to show that Products had positive environmental attributes, including that they had "less global warming potential," "less fossil fuels use," and "less water" (among others), when in fact numerous products consume "more" of those resources.  H&M conveniently, and egregiously, "ignored negative signs in Higg Index scores," and simply presented them as "positive" results in every instance (*i.e.*, using "more water" was turned into "less water" when H&M presented the scorecards).  This was a uniform practice for each and every Sustainability Profile scorecard.

11.    In fact, Quartz further found that a majority of the Products are no more sustainable than items in the main collection, which are also not sustainable.  H&M thus seeks to sell consumers on falsified and misleading "greenwashed" claims.

12.    Following the results of the Quartz investigation, H&M removed all of the Sustainability Scorecards presented for the Products.  Quartz indicated that the "rapid retreat by H&M and its industry peers adds to the argument that there is no such thing as sustainable fast fashion."

13.    While H&M represented that it was sharing information about the environmental impact of its Products, it miscoded items to provide an environmentally rosy picture of the Products that was "totally wrong."

14.    Accordingly, Defendant has mischaracterized several components of its calculations, providing Sustainability Profiles that are false and misleading.

15.    Defendant has claimed that the correct underlying data was available for consumers to review on a different third-party website.  But full access to the underlying data on the third-party website was only made available to companies that pay a fee, significantly undermining H&M's claims about purported accessibility to consumers.

16.    By incorporating the Sustainability Profiles directly into Defendant's online product listings, the Sustainability Profiles became part and parcel of Defendant's labeling,

packaging, and marketing.  Defendant chose to including the Sustainability Profiles in its online product listings (*i.e.*, its marketing) because it knew that they were material and would be relied upon by reasonable consumers, who care about global warming potential, fossil fuel use, and water use, among other environmental considerations.

**B.      Sustainability Misrepresentations**

17.      Though H&M's use of Sustainability Profiles is egregious on its own, it is part of a larger greenwashing campaign filled with additional Sustainability Misrepresentations.

18.      H&M states that certain of its Products, called the Conscious Collection, contains "at least 50% sustainable materials, such as organic cotton and recycled polyester."  But Defendant includes Products that are comprised of indisputably unsustainable materials, like polyester.  Products containing sometimes even up to 100% polyester are not sustainable, as polyester does not biodegrade, sheds toxic microfibers, and is not recyclable.

19.      Troublingly, the Products contain a higher percentage of synthetics than the main collection, but Defendant gives consumers the impression that the materials used in its Products are nonetheless environmentally sustainable.  The high use of synthetic materials such as polyester in the Products is particularly concerning for the reasons previously described.

20.      To this latter point, Defendant touts a recyclability program with bins in stores to convince consumers that they can purchase products without adding to the significant waste of the fast-fashion industry.



21.     But Defendant's representations that old clothes are simply turned into new garments, or that clothes will not end up in a landfill, are misleading.

22.     The vast majority of the Products are not in fact recyclable.  Due to the fibers used in the Products, recycling solutions either do not exist or are not commercially available for the vast majority of the Products.  In practice, H&M recycles only a small portion of what it collects in its in-store "recycle bins."

23.     According to environmentalist Elizabeth Cline, less than one percent of material used to produce clothing is recycled to make new clothing, representing enormous losses and leading to obscene amounts of waste.

24.     H&M does not eliminate waste; it creates it.  The sheer volume of textiles produced by H&M, one of the world's largest retailers, is unworkable.  It would take H&M more than a decade to recycle what it sells in a matter of days.  As such, unsurprisingly, H&M has been found to dump unsold inventory, adding to landfills.  This effectively wastes the materials used to manufacture the garments, together with the resulting environmental impact of the manufacturing process.

25.     Moreover, I:Collect, the company that handles the donations for H&M, indicates

that only 35 percent of what it collects is recycled and used for products like carpet padding, painters' cloths or insulation.  Much of the products, if not immediately disposed of, thus end up in second-hand clothing markets, and then landfills and incinerators.

26.    For example, the image below shows piles and bonfires of discarded clothes in Nairobi, Kenya.  Textiles are donated or sold to second-hand markets such as Kenya, which received 185,000 tons of second-hand clothing in 2019.  Second-hand clothes are often difficult to reuse or sell for various reasons, including low quality.  And reports show that because much of the clothing is in fact unsellable, it heads to landfills.



27.    Apart from the obvious environmental concerns from such massive waste, clothing donations and sales have destroyed the textile industry in many countries to the point that some have considered banning donations from the West.[2]

28.    Ironically, H&M itself does not make significant use of purportedly "recycled" materials.  H&M only uses an insignificant amount of recycled materials in its production.  For

---

[2] *See*, *e.g.*, Franck Kuwonu, Protectionist ban on imported used clothing, UN AFRICA RENEWAL, available at https://www.un.org/africarenewal/magazine/december-2017-march-2018/protectionist-ban-imported-used-clothing.

example, H&M used only 0.7% recycled materials in 2016, 0.5% recycled materials in 2017, and 1.4% recycled materials in 2018.

29.     Worse, as to the recycled material that Defendant does use, H&M does not employ the environmentally "circular" solutions that it claims to, such as its use of recycled polyester sourced from plastic bottles.  When Defendant utilizes recycled plastic bottles for Products, the recyclability of those Products is then further limited.  Rather than "closing the loop," this practice lessens any environmental benefit of the Products.  Whereas bottles could be recycled again for use in the packaging industry, converting them to textile products quickens the path to the landfill, absent viable wide-scale solutions for such products.

30.     H&M nonetheless misleadingly claims that its use of recycled polyester "stops [plastic waste] from ending up in landfills."  Instead, H&M's practices *hasten* the path to landfills.  Further, as alleged above, H&M is in the practice of discarding unsold inventory.

31.     Accordingly, the use of advertising phrases in Defendant's marketing scheme such as "recycling," "circular," and "closing the loop" are false and misleading.

32.     Despite the deceptive nature of its marketing, H&M actively incentivizes consumers to purchase more and more of the Products.  For example, H&M created a program where consumers can gain "Conscious points" for its "Conscious Choice products."

**C.     H&M Drives Harmful Environmental Impacts**

33.     Defendant and its Products are not sustainable, and any marketing efforts to suggest otherwise are at odds with its business model, which is based on trend-driven, high-volume designs for fast-fashion products that negatively impact the environment.

34.     H&M uses the same harmful practices as the rest of the fast-fashion industry.  But H&M tries to hide its devastating environmental impact with its deceptive advertising, including its attempt to prove its sustainability bona fides with falsified positive metrics.

35.     H&M is a global industry leader of fast fashion, which is one of the top polluting industries worldwide.  In fact, H&M pioneered the fast-fashion industry and has earned its recognition as one of fashion's largest polluters.   Although selling high volumes of clothes at low prices has proved to be a profitable business model, it wreaks a devastating environmental impact.

36.     According to the U.S. Environmental Protection Agency, the amount of clothing and footwear waste each year went from around 1.4 million tons in 1960 to over 13 million tons in 2018.  Approximately 70% of that clothing ends up in landfills.  Around 13% was recycled or reused, but that data is likely skewed, as donated clothes still often end up in landfills in the U.S. or other countries.

37.     The harmful environmental impact of the fashion industry is extensive.  At least half of the products produced by the fast-fashion industry is disposed of in less than a year, and in the United States, clothes are worn for around a quarter of the global average.  In addition to the colossal amount of waste generated from solid textiles, the fashion industry consumes high amounts of energy and water, uses harmful chemicals during the manufacturing process, and generates heavy global emissions.  Pollutants are released during the entire lifecycle of a textile product.  There are also hefty direct local impacts, where production carries negative effects on the surrounding environment, farmers, and factory workers.  As one of the largest manufacturers in the world, and the second largest retailer in the world, H&M is a key driver of these negative environmental impacts.

38.     The fashion industry is the second-biggest consumer of water and is responsible for ten percent of global greenhouse gas emissions, which, in part, come from "pumping water to irrigate crops like cotton, oil-based pesticides, machinery for harvesting, and emissions from transport."  According to the United Nations Environment Program, the fashion industry

accounts for a significant percentage of wastewater and more global carbon dioxide output than international flights and shipping combined.  Multitudes of hazardous substances escape into the environment and affect the health of both textile workers and consumers.

39.     The fashion industry also accounts for a significant percentage of plastic produced globally.  Garments made from synthetic fibers such as polyester, a form of plastic derived from oil, are a prime source of microplastic pollution, which is especially harmful to marine life.  In fact, the fashion industry sends half a million tons of microplastics into the oceans from the washing of plastic-based textiles such as polyester, nylon, or acrylic.  Microplastics harm not only wildlife, but also make their way up the food chain to humans, raising a host of health risks.

40.     According to the World Bank, the fast-fashion model is exacerbating the problem by stepping up the pace of design and production.  And a business model "based on volume" is "not what's part of the sustainable movement in any industry."[3]

41.     Among international organizations and journalists, it is established that the practices of fast-fashion giants like H&M are not sustainable.  Even large fashion retailers have made clear that it is misleading to try to hide such wasteful, resource-intensive, and dirty practices with greenwashed terms.

42.     Other leading brands acknowledge the fundamental inconsistency of sustainability claims from fast-fashion giants and choose to abstain from using terms such as "sustainable" and "conscious" in connection with its products and brand so as to not mislead consumers with greenwashing claims.

43.     For example, Patagonia has directly acknowledged the greenwashing problem of fast-fashion behemoths.  Though Patagonia itself prioritizes long-lasting durable clothing, and

---

[3] Samantha Masunaga, *Does fast fashion have to die for the environment to live?*, LOS ANGELES TIMES (Nov. 3, 2019), https://www.latimes.com/business/story/2019-11-03/fast-fashion-sustainable.

uses recycled materials and certified materials such as certified organic cotton to eliminate the use of synthetic pesticides, it is careful not to deceive consumers with greenwashing claims. Patagonia intentionally does not use terms like "sustainable," "green" and "conscious" because it acknowledges that it is part of the problem as, in its own words, the fashion "industry is a waste, and it's getting worse." Patagonia explains that the "world's largest clothing brands hide dirty, irresponsible practices" and misuse such terms to greenwash their undeniably negative impacts, including "pollution, labor abuses and waste."

44.     Despite H&M's extensive misuse of greenwashing terms doubled down with its deceptive overuse of the color green in its advertising and packaging, it remains a fast-fashion giant that contributes significantly to negative environmental harms. H&M has been repeatedly criticized for its misleading greenwashing marketing claims that are at odds with its harmful environmental impact.

45.     For example, in 2017, H&M received backlash when it was discovered that a Swedish power plant was burning discarded clothing from H&M. H&M has been heavily criticized for its volume-driven productions that generate unnecessary waste. In 2018, H&M "alarmed" investors "by reporting $4.3 billion of inventory on hand — an amount that had been creeping upward, indicating that it was producing more than it could sell. The company had to offer more discounts in order to get rid of the excess, and it couldn't stop stocking up on new styles."[4] In the years since, its stockpile has reportedly remained roughly the same. And as previously noted, H&M has been found to cut up and dump unwanted inventory.

46.     Additionally, H&M uses hugely energy-intensive materials that harm the environment. For example, cotton and polyester, significant sources of raw materials for the

---

[4] *Id.*

Products, are heavily energy-intensive and release contaminants.  In 2015, polyester production for clothing emitted 282 billion tons of carbon dioxide, triple the amount from that of cotton.

47.    As previously noted, H&M uses a significant percentage of plastic-based materials in its Products.  Synthetic materials like polyester shed plastic particles, called microplastics, with wash and wear.  And textiles are the largest source of microplastic pollution in the world's oceans.  According to the U.S. Geological Survey, 71% of microplastics found in samples of river water came from textiles.  Additionally, synthetic, plastic-based materials like polyester are not biodegradable or recyclable, require loads of energy for extraction and processing, and are derived from nonrenewable resources.

48.    The Products also use a blend of fibers, which present an additional challenge for degradation or recycling.  Textiles containing different types of fiber are immensely difficult to recycle.  And recycling technology for the Products is not sufficiently advanced for an industrial scale.  But H&M gives consumers the impression that Products will not add to the colossal waste of the fashion industry by displaying recycling bins to purportedly keep Products from landfills.

49.    As previously noted, H&M actively incentivizes consumers to make "conscious" purchases to accumulate points and make even more purchases of its Products.

50.    Based on Defendant's extensive greenwashing campaign, a reasonable consumer would expect the Products to be sustainable, that H&M provides accurate information about its Products' attributes and environmental impact, that H&M does not massively contribute to harmful environmental impacts, and that H&M's recyclability program avoids the piling of clothes in landfills.  Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiffs that its Products are not sustainable, that it includes inaccurate information about its Products, that the majority of its Products are not recyclable, and that it is one of the industry's greatest polluters.   Although H&M uses representations such as its

Products being the "shortcut to sustainable choices," they simply do not provide sustainable choices.

### D. Sustainability Drives Consumer Preferences, And Consumers Pay A Price Premium For Sustainable Products

51.     Research shows that consumers pay a price premium for products marketed as sustainable.  For example, one study examining consumer fashion preferences showed that consumers concerned about sustainability paid 15 percent more for sustainable products.

52.     The interest in sustainable products and the accompanying price premium for those products has grown sizably in recent years.  For example, one recent survey reported that "Gen X consumers' preferences to shop sustainable brands increased by nearly 25%," with a 42% price premium associated with sustainable products."[5]

53.     These growing preferences hold across segments of consumers.  In fact, consumers across all generations – from Baby Boomers to Gen Z – pay a price premium for sustainable products.[6]

54.     H&M incorporates these consumer insights into its marketing strategy.  As previously described, H&M admits that sustainability is important to consumers.  It thus has emphasized sustainability through its website, product tags, and other marketing.

55.     Importantly, research has shown that consumers largely rely on brand websites and product tags to understand whether a brand is sustainable.  Accordingly, the deceptive nature of H&M's Sustainability Profiles and Sustainability Misrepresentations on its brand websites and product tags is material to the reasonable consumer, and induces them to pay a price premium for

---

[5] Greg Petro, *Consumers Demand Sustainable Products And Shopping Formats*, FORBES (March 11, 2022), https://www.forbes.com/sites/gregpetro/2022/03/11/consumers-demand-sustainable-products-and-shopping-formats/?sh=346770d76a06.

[6] *Id.*

H&M's Products.

56.     Consumers are willing to pay a price premium because, as a result of Defendant's false, misleading, and/or deceptive marketing, they believe the Products have environmental attributes Defendant ascribes, when in fact, they do not.

57.     Indeed, in viewing H&M's Products marketed with Sustainable Profiles and the Sustainability Misrepresentations, Plaintiff Commodore and Plaintiff Scarlett paid a price premium for the Products they purchased.

58.     Because of the trend-driven and competitive nature of the fashion industry, competing large retailers offer comparable designs as H&M each fashion season.  These competing fast-fashion retailers do not, however, make sustainability claims in marketing otherwise similar product offerings.

59.     As such, there are lower-priced alternatives to H&M's Products at issue, including products offered by H&M and its competitors.

60.     H&M adds a significant upcharge for the Products compared to similar products that do not market a Sustainability Profile or Sustainability Misrepresentation.  For each purchase at issue, Plaintiffs could have purchased a comparable item offered for less by a competing retailer or by H&M itself.  Instead, Plaintiffs paid a price premium as a result of H&M's false, misleading, unfair, and/or deceptive marketing.

61.     For example, Plaintiff Scarlett purchased a pink cotton t-shirt from the Conscious Collection marketed for $12.99.  H&M itself markets a pink cotton t-shirt without any Sustainability Profile or Sustainability Misrepresentations for $5.99.  And competing large retailers offer similar products for a lower price.  For instance, Fashion Nova offers a comparable pink cotton t-shirt for $9.99.

62.     To take another example, Plaintiff Commodore purchased a black cardigan from

the Conscious Collection marketed for $34.99.  H&M itself markets a black cardigan without any Sustainability Profile or Sustainability Misrepresentations for $17.99.  And competing large retailers offer similar products for a lower price.  For instance, Forever 21 offers a comparable black cardigan for $20.99.

## PARTIES

63.     Plaintiff Chelsea Commodore is a citizen of New York who resides in Hopewell Junction, New York.

64.     Plaintiff Rakeedha Scarlett is a citizen of New York who resides in Bronx, New York.

65.     Defendant H&M Hennes & Mauritz LP is a New Jersey corporation with a principal place of business in Secaucus, New Jersey.

66.     Defendant is a multinational clothing company built on direct-to-consumer sales.

67.     Defendant's Products are sold to consumers through its website and its brick-and-mortar stores.

68.     Plaintiffs have viewed Defendant's Products in-store and online.

69.     Within the applicable limitations period, Plaintiff Commodore has purchased various clothing items from H&M's Conscious Collection both online and in-store.  For example, Plaintiff Commodore bought a $29.99 sweater from Defendant's Conscious Collection from a brick-and-mortar H&M store located in Middletown, New York.  Plaintiff Commodore also bought a $34.99 cardigan from Defendant's Conscious Collection from H&M's website. Prior to making her purchases, Plaintiff Commodore reviewed and considered H&M's Sustainability Profiles.  Further, prior to both purchases, Plaintiff Commodore reviewed the labeling, packaging, and marketing materials of her Products.

70.     Within the applicable limitations period, Plaintiff Scarlett has purchased various clothing items from H&M's Conscious Collection both online and in-store, including at the brick-and-mortar H&M store located in White Plains.  For example, Plaintiff Scarlett bought a $24.99 tulle set and $19.99 denim jacket from Defendant's Conscious Collection from H&M's website.  Plaintiff Scarlett also bought two $29.99 wrap dresses and a $12.99 pink cotton t-shirt from Defendant's Conscious Collection from H&M's website.  Prior to her purchases, Plaintiff Scarlett reviewed and considered H&M's Sustainability Profiles.  Further, prior to her purchases, Plaintiff Scarlett reviewed the labeling, packaging, and marketing materials of her Products.

71.     Plaintiffs reasonably believed that H&M provided accurate information about the environmental attributes of its Products, and these representations were material to Plaintiffs. Plaintiffs reasonably relied on Defendant's Sustainability Score and the Sustainability Misrepresentations in deciding to purchase the Products, and these representations were part of the basis of the bargain in that they would not have purchased the Products, or would not have purchased it on the same terms, had they known that these representations were false and misleading.  As a direct result of Defendant's material misrepresentations and omissions, Plaintiffs suffered and continue to suffer, economic injuries in the form of a price premium for the Products.

72.     Plaintiffs chose between Defendant's Products and other textile products.  Yet, the Products were worth less than what Plaintiffs paid and would not have paid as much, or would not have purchased the Products at all, absent Defendant's false and misleading statements and omissions.

73.     Plaintiffs intend to, seek to, and will purchase the Products again and wish to do so with the assurance that the Product's representations are accurate.  But they are unable to make informed decisions about whether to purchase Defendant's Products and will be unable to

meaningfully evaluate the different prices between Defendant's Products and competitor's

Products.  Because Defendant manufactures an evolving product line with varied designs and

compositions, it is difficult for Plaintiffs to know the true nature of the Products.  Plaintiffs are

thus further likely to repeatedly be misled by Defendant's conduct, unless and until Defendant is

compelled to ensure Products are marketed and advertised in a truthful and non-misleading way.

## JURISDICTION AND VENUE

74.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A),

as modified by the Class Action Fairness Act of 2005, because there are more than 100 Class

Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00,

exclusive of interest and costs, and at least one Class Member is a citizen of a state different than

Defendant.

75.    This Court has personal jurisdiction over Defendant because it transacts business

in the United States, including in this District, has substantial aggregate contacts with the United

States, including in this District, engaged in conduct that has and had a direct, substantial,

reasonably foreseeable, and intended effect of causing injury to persons throughout the United

States, and purposely availed itself of the laws of the United States and the State of New York,

and further, because many of the acts and transactions giving rise to this action occurred in this

District.

76.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because this

District is where a substantial part of the conduct giving rise to Plaintiff's claims occurred, where

Defendant transacts business, and where Plaintiff purchased the Products.

## CLASS ALLEGATIONS

77.    Plaintiffs bring this action pursuant to Rule 23(a) of the Federal Rules of Civil

Procedure on behalf of a class and subclass of similarly situated individuals, defined as follows:

(a)     ***Nationwide Class.***   Plaintiffs seek to represent a nationwide class of similarly situated individuals, defined as all persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue (the "Nationwide Class" or "Class").

(b)     ***New York Subclass.***   Plaintiffs also seek to represent a subclass of all Class members who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue in New York (the "New York Subclass" or "Subclass").

78.     Excluded from the Class are persons who made such purchases for purposes of resale.

79.     Plaintiffs reserve the right to amend the definitions of this Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

80.     The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Plaintiffs reasonably estimate that there are tens of thousands of members in the Class and Subclass.  Although the precise number of Class and Subclass members is unknown to Plaintiffs at this time, the true number of Class and Subclass members is known by Defendant and may be determined through discovery.

81.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to members of the Class and Subclass predominate over questions that may affect individual Class and Subclass members include, but are not limited to:

(a)     whether Defendant's representations are misleading;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)      whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class;

(d)      whether Defendant issued warranties concerning the Products' environmental attributes and whether Defendant breached these warranties;

(e)      whether Plaintiffs and members of the Class and Subclass are entitled to damages and/or restitution.

82.      Plaintiffs' claims are typical of those of the Class and Subclass because Plaintiffs, like all members of the Class and Subclass, purchased, in a typical consumer setting, Defendant's Products, and Plaintiffs sustained damages from Defendant's wrongful conduct.

83.      Plaintiffs are adequate representatives of the Class and Subclass because their interests do not conflict with the interests of the Class and Subclass they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class and Subclass will be fairly and adequately protected by Plaintiffs and their counsel.

84.      The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Subclass.  Each individual Class and Subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### Deceptive Acts or Practices, New York General Business Law § 349

85.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

86.     Plaintiffs bring this claim individually and on behalf of members of the New York Subclass against Defendant.

87.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making false and misleading representations in its display, tags, and online information, including information on Defendant's website.

88.     The foregoing deceptive acts and practices were directed at consumers.

89.     The foregoing deceptive acts and practices are misleading in a material way because they misrepresent the sustainability and attributes of the Products to induce consumers to purchase H&M's Products.  Upon reading the representations detailed above, including the Sustainability Profiles and Sustainability Misrepresentations, a consumer acting reasonably under the circumstances would reasonably believe those claims, particularly given that H&M is a nationally recognized and well-established company.

90.     Additionally, Defendant seeks to differentiate itself from other fashion products by greenwashing the Products and its brand.  This is a deceptive act and an unfair practice because Defendant, one of fashion's greatest polluters, knows that the Products are not sustainable and contribute to significant negative environmental harms over the entire product life cycle from cultivation to incineration.

91.     As noted above, other leading fashion companies with similar manufacturing practices specifically abstain from making greenwashing claims like those that H&M does so as to not mislead consumers.

92.     Defendant's misrepresentations are material to Plaintiffs and reasonable consumers.  Plaintiffs reasonably relied on Defendant's Sustainability Score and the Sustainability Misrepresentations in deciding to purchase the Products, and these representations were part of the basis of the bargain in that they would not have purchased the Products, or would not have purchased it on the same terms, had they known that these representations were false and misleading.

93.     As a result of Defendant's misrepresentations, including but not limited to the misrepresentations described herein, Plaintiffs and members of the New York Subclass have suffered economic injury because Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

94.     On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, reasonable attorneys' fees and costs, and an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under Section 349 of the New York General Business Law.

**COUNT II**
**False Advertising, New York General Business Law § 350**

95.     Plaintiffs reincorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

96.     Plaintiffs bring this claim individually and on behalf of members of the New York Subclass against Defendant.

97.     Based on the foregoing, by its use of the Sustainability Profiles and its Sustainability Misrepresentations, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.  The advertising was directed at consumers

and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

98.     Additionally, Defendant seeks to differentiate itself from other fashion products by greenwashing the Products and its brand.  This is a deceptive act and an unfair practice because Defendant, one of fashion's greatest polluters, knows that the Products are not sustainable and contribute to significant negative environmental harms over the entire product life cycle from cultivation to incineration.

99.     As noted above, other leading fashion companies with similar manufacturing practices specifically abstain from making greenwashing claims like those that H&M does so as to not mislead consumers.

100.    The misrepresentations have resulted in consumer injury or harm to the public interest.

101.    Defendant's misrepresentations are material to Plaintiffs and reasonable consumers.  Plaintiffs reasonably relied on Defendant's Sustainability Score and the Sustainability Misrepresentations in deciding to purchase the Products, and these representations were part of the basis of the bargain in that they would not have purchased the Products, or would not have purchased it on the same terms, had they known that these representations were false and misleading.

102.    As a result of these misrepresentations, including but not limited to the misrepresentations described herein, Plaintiffs and members of the New York Subclass have suffered economic injury because Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

103.    On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, reasonable attorneys' fees and costs, and an order enjoining

Defendant's deceptive conduct, and any other just and proper relief available under Section 350 of the New York General Business Law.

<strong><u>COUNT III</u><br>Breach of Express Warranty</strong>

104.     Plaintiffs reincorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

105.     Plaintiffs bring this claim individually and on behalf of members of the Nationwide Class and the Subclass against Defendant.

106.     In connection with the sale of the Products, Defendant issued express warranties concerning the environmental attributes of the Products, including through its use of the Sustainability Profiles and the Sustainability Misrepresentations.

107.     Defendant's affirmations of fact and promises made to Plaintiffs and the Class became part of the basis of the bargain between Defendant on the one hand, and Plaintiffs and the Class Members on the other, thereby creating express warranties that the Products would conform to Defendant's affirmations of fact, representations, promises, and descriptions.

108.     Defendant breached its express warranties because the Products did not conform to the Defendant's representations.  As described above, Defendant uniformly falsified the underlying data of the Sustainability Profiles.  And Defendant's Sustainability Misrepresentations centered around Defendant's Sustainability Profiles, such that those representations are also unwarranted.  In short, the Products are not as expressly warranted.

109.     Defendant's misrepresentations are material to Plaintiffs and reasonable consumers.  Plaintiffs reasonably relied on Defendant's Sustainability Score and the Sustainability Misrepresentations in deciding to purchase the Products, and these representations were part of the basis of the bargain in that they would not have purchased the Products, or

would not have purchased it on the same terms, had they known that these representations were false and misleading.

110.    Plaintiffs and the Class Members were injured as a direct and proximate result of Defendant's breach because the Products did not have the quality, or value as promised. Plaintiffs and Class members would not have purchased the Products or paid as much if the true facts had been known.  As a result, Plaintiffs and the Class have been damaged by the difference in value between the Products as advertised and the Products as actually sold.

111.    On or about October 11, 2022, a notice letter was served on Defendant which complies in all respects with U.C.C § 2-607.  Plaintiffs, individually and on behalf of the putative Class, sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it breached numerous warranties and violated state consumer protection laws, and demanding that Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom.

### COUNT IV
### Unjust Enrichment

112.    Plaintiffs reincorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

113.    Plaintiffs bring this claim individually and on behalf of members of the Nationwide Class and the Subclass against Defendant.

114.    Plaintiffs and Class members conferred a benefit in the form of monies paid on Defendant by purchasing the Products.

115.    Defendant voluntarily accepted and retained this benefit.

116.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for the Products, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

seeks judgment against Defendant, as follows:

A.      For an order certifying the Class and Subclass under Fed. R. Civ. P. 23 and naming Plaintiffs as representative of the Class and Subclass and Plaintiffs' attorneys as Class Counsel;

B.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

C.      For an order finding in favor of Plaintiffs, the Class and Subclass on all counts asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper;

H.      For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.


Dated: January 6, 2023                              Respectfully submitted,

                                                    **BURSOR & FISHER, P.A.**

                                                    By:    */s/ Neal J. Deckant*

                                                    L. Timothy Fisher (*pro hac vice* forthcoming)
                                                    Neal J. Deckant (NY State Bar No. 5026208)
                                                    Elvia M. Lopez (*pro hac vice*)
                                                    Sean L. Litteral (*pro hac vice* forthcoming)
                                                    1990 North California Blvd., Suite 940
                                                    Walnut Creek, CA 94596
                                                    Telephone: (925) 300-4455
                                                    Facsimile: (925) 407-2700
                                                    Email: ltfisher@bursor.com

ndeckant@bursor.com
elopez@bursor.com
slitteral@bursor.com

*Attorneys for Plaintiffs*